## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
## KNOXVILLE

| | |
|---|---|
| YANXIA SUN, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>RUBY TUESDAY, INC., JAMES F. HYATT, II, STEPHEN I. SADOVE, MARK W. ADDICKS, DONALD E. HESS, KEVIN T. CLAYTON, JEFFREY J. O'NEILL, BERNARD LANIGAN, JR., F. LANE CARDWELL, JR., RTI HOLDING COMPANY, LLC, RTI MERGER SUB, LLC, and NRD PARTNERS II, L.P.,<br><br>Defendants, | )<br>)<br>)<br>)<br>)  Civil Action No. 3:17-cv-00482<br>)<br>)<br>)  **CLASS ACTION COMPLAINT**<br>)  **FOR VIOLATIONS OF**<br>)  **SECTIONS 14(a) AND 20(a) OF**<br>)  **THE SECURITIES EXCHANGE**<br>)  **ACT OF 1934**<br>)<br>)<br>)<br>)  **JURY TRIAL DEMAND**<br>) |

## CLASS ACTION COMPLAINT

Plaintiff Yanxia Sun ("Plaintiff"), individually and on behalf of all others similarly situated, alleges the following upon information and belief, including investigation of counsel and review of publicly-available information, except as to those allegations pertaining to Plaintiff, which are alleged upon personal knowledge:

## NATURE OF THE ACTION

1.      Plaintiff brings this class action on behalf of the public stockholders of Ruby Tuesday, Inc. ("Ruby Tuesday" or the "Company") against Ruby Tuesday's Board of Directors (the "Board" or the "Individual Defendants") for their violations of Section 14(a) and 20(a) of the Securities Exchange Act of 1934, 15.U.S.C. §§ 78n(a), 78t(a),  and SEC Rule 14a-9, 17 C.F.R.

1

240.14a-9, arising out of the Board's attempt to sell the Company to NRD Partners II, L.P. through its affiliate RTI Holding Company, LLC and its wholly-owned subsidiary RTI Merger Sub, LLC (collectively "NRD Capital").

2.      Defendants have violated the above-referenced Sections of the Exchange Act by causing a materially incomplete and misleading preliminary proxy statement (the "Proxy") to be filed with the Securities and Exchange Commission ("SEC") on October 31, 2017.  The Proxy recommends that Ruby Tuesday shareholders vote in favor of a proposed transaction (the "Proposed Transaction") whereby Ruby Tuesday is acquired by NRD Capital. The Proposed Transaction was first disclosed on October 16, 2017, when Ruby Tuesday and NRD Capital announced that they had entered into a definitive merger agreement (the "Merger Agreement") pursuant to which NRD Capital will acquire all of the outstanding shares of common stock of Ruby Tuesday for $2.40 per share (the "Merger Consideration").  The deal is valued at approximately $335 million and is expected to close in the first quarter of 2018.

3.      While Ruby Tuesday has faced challenges over the past couple of years, the Board determined in early 2017 to sell the Company despite the concurrent implementation of strategies intended to increase shareholder value. For example, an improved salad bar feature was launched in mid-January 2017, yet the Board decided on January 14, 2017 to begin discussing strategic alternatives. The Board also hired a CEO in April 2017 known for helping restaurant companies facing challenging financial situations, but structured his employment agreement based on a sale of the Company in the near future.

4.      Even when the Board undertook its strategic review, it favored NRD Capital over other bidders and favored a sale of the Company over other possible transactions. Other bidders offered much higher consideration than NRD Capital, and NRD Capital failed time and again to

2

address the Board's concerns about financing, yet the Board decided to sell the Company to NRD Capital. And despite offers to sell certain real estate holdings, or even securing financing structured from the real estate holdings, the Board failed to engage in serious negotiations or discussions to advance any such transaction.

5.     Furthermore, the Proxy is materially incomplete and contains misleading representations and information in violation of Sections 14(a) and 20(a) of the Exchange Act. Specifically, the Proxy contains materially incomplete and misleading information concerning the sales process, financial projections prepared by Ruby Tuesday management, as well as the financial analyses conducted by UBS Securities LLC ("UBS"), Ruby Tuesday's financial advisor.

6.     For these reasons, and as set forth in detail herein, Plaintiff seeks to enjoin Defendants from taking any steps to consummate the Proposed Transaction, including filing a definitive proxy statement ("Definitive Proxy") with the SEC or otherwise causing a Definitive Proxy to be disseminated to Ruby Tuesday's shareholders, unless and until the material information discussed below is included in the Definitive Proxy or otherwise disseminated to Ruby Tuesday's shareholders. In the event the Proposed Transaction is consummated without the material omissions referenced below being remedied, Plaintiff seeks to recover damages resulting from the Defendants' violations.

## PARTIES

7.     Plaintiff is, and has been at all relevant times, the owner of shares of common stock of Ruby Tuesday.

8.     Defendant Ruby Tuesday is a corporation organized and existing under the laws of the State of Georgia.  The Company's principal executive offices are located at 333 East Broadway Avenue, Maryville, Tennessee 37804. Ruby Tuesday common stock trades on NYSE under the

3

ticker symbol "RT." Ruby Tuesday is a multinational foodservice retailer that owns, operates, and franchises Ruby Tuesday restaurants.

9.     Defendant James F. Hyatt, II has been President and CEO of the Company and a director of the Company since April 6, 2017.

10.     Defendant Stephen I. Sadove has been a director of the Company since 2002 and Chairman of the Board since September 2016. Defendant Sadove served as Lead Independent Director prior to being named Chairman of the Board.

11.     Defendant Mark W. Addicks has been a director of the Company since 2014.

12.     Defendant Donald E. Hess has been a director of the Company since 2014.

13.     Defendant Kevin T. Clayton has been a director of the Company since 2006.

14.     Defendant Jeffrey J. O'Neill has been a director of the Company since 2012.

15.     Defendant Bernard Lanigan, Jr. has been a director of the Company since 2001.

16.     Defendant F. Lane Cardwell, Jr. has been a director of the Company since 2012. From September 13, 2016 through April 6, 2017, Defendant Cardwell served as Interim President and CEO of the Company.

17.     Defendants Shyatt, Sadove, Addicks, Hess, Clayton, O'Neill, Lanigan and Cardwell are collectively referred to herein as the "Board."

18.     Defendant NRD Capital Inc. is a private equity fund based in xxx.

19.     Defendant RTI Holding Company, LLC is a Delaware limited liability company.

20.     Defendant RTI Merger Sub, LLC is a Georgia limited liability company and is a wholly owned subsidiary of RTI Holding Company, LLC.

## JURISDICTION AND VENUE

21.     This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange

Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Section 14(a) and 20(a) of the Exchange Act and SEC Rule 14a-9.

22.     Personal jurisdiction exists over each Defendant either because the Defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this District as to render the exercise of jurisdiction over Defendant by this Court permissible under traditional notions of fair play and substantial justice.

23.     Venue is proper in this District under Section 27 of the Exchange Act, 15 U.S.C. § 78aa, as well as under 28 U.S.C. § 1391, because: (i) the conduct at issue took place and had an effect in this District; (ii) Ruby Tuesday maintains its primary place of business in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein, occurred in this District; and (iv) Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## CLASS ACTION ALLEGATIONS

24.     Plaintiff brings this action on her own behalf and as a class action on behalf of all owners of Ruby Tuesday common stock and their successors in interest and/or their transferees, except Defendants and any person, firm, trust, corporation or other entity related to or affiliated with the Defendants (the "Class").

25.     This action is properly maintainable as a class action for the following reasons:

(a)     The Class is so numerous that joinder of all members is impracticable.  As of October 16, 2017, Ruby Tuesday had approximately 60.4 million shares outstanding.

5

(b)     Questions of law and fact are common to the Class, including, inter alia, the following:

(i)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

(ii)    Whether the Individual Defendants have violated Section 20(a) of the Exchange Act;

(iii)   Whether Plaintiff and other members of the Class would suffer irreparable injury were Defendants to file a Definitive Proxy with the SEC that does not contain the material information referenced above and the Proposed Transaction is consummated as presently anticipated;

(iv)    Whether the Individual Defendants, in bad faith and for improper motives, impeded or erected barriers to discourage other strategic alternatives, including offers from interested parties for the Company or its assets;

(v)     Whether Plaintiff and the other members of the Class would be irreparably harmed were the transaction complained of herein consummated; and

(vi)    Whether the Class is entitled to injunctive relief or damages as a result of Individual Defendants' wrongful conduct.

(c)     Plaintiff is committed to prosecuting this action, is an adequate representative of the Class, and has retained competent counsel experienced in litigation of this nature.

6

(d)     Plaintiff's claims are typical of those of the other members of the Class.

(e)     Plaintiff has no interests that are adverse to the Class.

(f)     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications for individual members of the Class and of establishing incompatible standards of conduct for the party opposing the Class.

(g)     Conflicting adjudications for individual members of the Class might as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests.

(h)     Plaintiff anticipates that there will be no difficulty in the management of this litigation.  A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## FURTHER SUBSTANTIVE ALLEGATIONS

### A.  The Proposed Transaction is the Product of a Flawed Process and Undervalues the Company

26.     Ruby Tuesday is a casual dining restaurant chain with restaurants in 41 states, 14 foreign countries, and Guam. As of June 6, 2017, the Company owned and operated 543 restaurants, while 22 franchisees operated 62 restaurants.

27.     For each year beginning in the fiscal year that ended in May 2013, Ruby Tuesday reported increased losses and decreased revenue. However, it was not until the fiscal year ending May 2016 that the Company reported a marked increase in net loss and loss from continuing operations. In August 2016, the Company announced that it would close approximately 95 restaurants that it believed provided "limited upside." That same month, Ruby Tuesday launched the Fresh Start Initiative. This initiative planned to edit the menu, improve its salad bar offerings, and remodel stores. The restaurant closings and Fresh Start Initiative were intended to improve

7

profitability and create long-term shareholder value.

28.     On September 13, 2016, just one month after announcing the Fresh Start Initiative, Ruby Tuesday announced that CEO James J. Buettgen had resigned. Defendant Cardwell was named Interim President and Chief Executive Officer of the Company while the Board searched for Buettgen's replacement. At the same time, Defendant Sadove was named non-executive Chairman of the Board.

29.     On January 5, 2017, Ruby Tuesday issued a press release announcing financial results for the quarter ending November 29, 2016. This was the first quarter with Defendant Cardwell at the helm. The Company reported declines in total revenue and same-restaurant sales, and increases in net loss and expenses related to closures and impairments. Despite the disappointing results, Defendant Cardwell stated that the launch of a new menu in November 2016 and improved salad bar in January 2017 would "change the trajectory of our business and drive shareholder value."

30.     Wall Street was not convinced. On January 9, 2017, Moody's Investors Service revised Ruby Tuesday's rating outlook from stable to negative, and downgraded the Company's "Speculative Grade Liquidity Rating." Moody's noted that it expected it would be more difficult for Ruby Tuesday to improve its situation as expected in the launch of the Fresh Start Initiative due to the industry's "highly promotional environment," as well as increased labor and operating costs. However, Moody's did admit that it believed that the Fresh Start Initiative would ultimately benefit the Company, but that "it will take time for these initiatives to show in the company's results."[1] An analyst wrote in a January 6, 2017 Seeking Alpha article entitled "Ruby Tuesday Can't Turn Around Until Management Changes Strategy:" "Even with a new CEO there appears

---

[1]         https://www.moodys.com/research/Moodys-affirms-Ruby-Tuesdays-B3-CFR-rating-outlook-revised-to--PR_360402

to be no real attempt to change strategy – or even promote any kind of coherent strategy to either consumers or investors."

31. In a press release issued on March 13, 2017, the Company announced that the Board was exploring strategic alternatives to maximize shareholder value "and position the business for long-term success." The sale of the Company was one of the alternatives being considered.

32. Defendant Hyatt became the President and CEO of Ruby Tuesday on April 6, 2017. In an April 6, 2017 press release announcing his appointment, the Company noted that Defendant Hyatt has "more than forty years of leadership experience in the restaurant industry." Defendant Hyatt had previously served as CEO of Church's Chicken from 2011 to 2016, where he "implemented a multi-tiered strategy to revitalize the brand, centering on the total guest experience including a focus on product consistency, product innovation, speed of service, facility management, unit profitability and operator engagement along with rolling out a global re-image standard for the brand." As of the end of 2016, Church's Chicken had system-wide revenues of approximately $1.2 billion. Prior to joining Church's Chicken, Defendant Hyatt was the CEO and Chairman for Cosi, where he "did an amazing job of getting Cosi reorganized and set in the right direction, despite the most difficult macro environment in a generation."[2] And before that, Defendant Hyatt was recruited to help Burger King "turn the brand around."[3]

33. On October 16, 2017, the Board entered into the Merger Agreement with NRD Capital affiliates RTI Holding Company, LLC and RTI Merger Sub, LLC.

34. The Board rushed into the Proposed Transaction without giving either Defendant Hyatt nor the Fresh Start Initiative enough time to effect a turnaround. The Merger Consideration is inadequate, given the Company's real estate holdings and the offers made by Bidder 11 and

_____

[2] http://fortune.com/2011/09/29/the-cosi-court-of-public-opinion/
[3] http://profilemagazine.com/2015/churchs-chicken/

9

Bidder 2. And the Board conducted a rushed process, focused more on a quick sale than maximizing shareholder value.

35.     Between March 13, 2017 and October 9, 2017, Ruby Tuesday received a number of offers that exceeded the value of the Proposed Transaction. In April 2017, the Company received preliminary indications of interest of $2.40 to $2.60 per share (from Bidder 1), $3.05 per share (Bidder 2), $3.25 to $3.40 (Bidder 3), $5.75 (Bidder 4) and $2.25 to $2.75 (Bidder 5). At that time, NRD Capital was offering $2.51 per share to acquire the Company. Bidder 8 offered a sale-leaseback transaction valued at $315 million. Even at the end of the process, two different bidders offered a higher price than NRD Capital: $2.50 per share (from Bidder 2) and $2.88 per share (from Bidder 11). These offers indicate that the value for the Company is much higher than that offered through the Proposed Transaction.

36.     The inadequate Merger Consideration is underscored by the fact that the price offered by NRD Capital, $2.40 per share, falls below the share value calculated by other analysts. For example, a discounted cash flow analysis performed in a January 17, 2017 Seeking Alpha article, entitled "Ruby Tuesday Is An Out Of Favor Cyclical That Is Undervalued," found a 35% upside to the Company's stock price of $2.19 as of January 17, 2017 or a per share value of approximately $2.96.

37.     Even the analyses of the Company's own financial advisors illustrate that the Merger Consideration may not be high enough. For example, UBS's *Selected Public Companies* analysis implied a per share equity value as high as $2.67, while the *Discounted Cash Flow Analysis* implied a per share equity value as high as $2.44.

38.     The Proposed Transaction, providing stockholders with less value than the higher offers and higher values implied by the Company's own financial advisor, was approved after a

dubious process. After the Board decided to conduct an auction of the Company, it still provided NRD Capital with an advantage, as indicated in the Proxy: "On March 19, 2017, at the request of Ruby Tuesday, Davis Polk sent an initial draft of a definitive transaction agreement to NRD's legal counsel to enable NRD to prepare a bid for Ruby Tuesday that would preempt the strategic alternatives process."

39.     Over and over again, NRD Capital either failed to provide the Board with proof of financing for a transaction, or provided insufficient proof. NRD Capital also submitted the lowest offer in April 2017. Yet the Board allowed NRD Capital to continue in the process and gave it multiple opportunities to strengthen its offer. That same consideration was not provided to other parties. For example, on October 9, 2017, Bidder 11 submitted an offer to purchase the Company for $2.88 per share. While the offer did not contain information about financing commitments, the Board did not request such information. Instead, two days later the Board told NRD Capital to submit its proposal to acquire the Company for $2.40 per share and then approved the Proposed Transaction on October 15, 2017, less than one week after receiving the offer from Bidder 11.

40.     The process also makes clear that the Board did not seriously consider a sale of real estate without a change of control. The Board continued discussions concerning a sale-leaseback with Bidder 8 through August 2017, but other bidders were ignored. For example, on May 4, 2017, Bidder 9 informed UBS that it was interested in acquiring a select portfolio of real estate held by the Company. While the Board discussed such a transaction with Bidder 8, no such discussions took place with Bidder 9. Bidder 2 also expressed interest in acquiring the Company's real estate holdings, but the Board did not engage in discussions with Bidder 2 about such a transaction. Instead, after Bidder 2 offered to purchase 62 properties for $46.5 million, the Board effectively ended discussions.

11

**B. Ruby Tuesday's Officers Stand to Receive Benefits Unavailable to the Class**

41.     The Proxy acknowledges that the Company's executive officers have interests in the merger that may differ from those of the stockholders and may create conflicts of interest.

42.     Stock options, restricted stock, service-based restricted stock units (including service-based phantom stock units) ("RSUs"), performance-based restricted stock units (including performance-based phantom stock units) ("PSUs") and phantom stock units that have been awarded to and are held by Ruby Tuesday's executive officers and directors will vest and be converted into the right to receive either the Merger Consideration or another amount. The treatment of these equity awards, in addition to benefits provided to executive officers through Ruby Tuesday's Change in Control Severance Plan, the 2005 Deferred Compensation Plan, and Defendant Hyatt's employment agreement, will create a windfall for Ruby Tuesday's executive officers that is unavailable to the common stockholders. As demonstrated in the following chart, the executive officers of Ruby Tuesday in total stand to receive up to $9.4 million, if they are let go without "cause" after the Proposed Transaction closes:

| Name | Cash | Equity | Perquisites/ Benefits | Total |
|------|------|--------|------|-------|
| James F. Hyatt, II | $850,000 | $1,184,374 | – | $2,034,374 |
| Linda Sue Briley | $1,134,047 | $283,541 | $48,235 | $1,465,823 |
| Michael K. Ellis | $1,110,714 | $273,077 | $50,946 | $1,434,737 |
| Rhonda J. Parish | $1,211,557 | $307,838 | $53,448 | $1,572,843 |
| Davis W. Skena | $1,177,381 | $302,978 | $52,854 | $1,533,213 |
| James J. Buettgen | – | – | – | – |
| F. Lane Cardwell, Jr. | – | – | – | – |
| Brett A. Patterson | – | – | – | – |
| Thomas A. Williams | $1,110,714 | $273,077 | $53,025 | $1,436,816 |

43.     The members of the Board and the executive officers stand to gain handsomely even if they stay on after the Proposed Transaction closes. In total, as demonstrated in the following chart, the executive officers and Board members will obtain more than $2.6 million:

12

| Name | Total Deferred Compensation Consideration | Total Option Consideration | Total Restricted Stock Consideration | Total RSU Consideration | Total Phantom Stock Unit Consideration | Total PSU Consideration |
|---|---|---|---|---|---|---|
| **_Named Executive Officers_** | | | | | | |
| James F. Hyatt, II | – | – | $1,184,374 | – | – | – |
| Linda Sue Briley | – | – | – | $39,259 | $157,894 | $86,388 |
| Michael K. Ellis | – | – | – | $28,795 | $157,894 | $86,388 |
| Rhonda J. Parish | $16,354 | – | – | $58,696 | $162,754 | $86,388 |
| Davis W. Skena | – | – | – | $58,696 | $157,894 | $86,388 |
| James J. Buettgen | – | – | – | – | – | – |
| F. Lane Cardwell, Jr. | – | – | – | – | – | – |
| Brett A. Patterson | – | – | – | – | – | – |
| **_Other Executive Officer_** | | | | | | |
| Thomas A. Williams | – | – | – | $28,795 | $157,894 | $86,388 |
| **_Directors_** | | | | | | |
| Stephen I. Sadove | $31,279 | – | – | – | – | – |
| Mark W. Addicks | – | – | – | – | – | – |
| Donald E. Hess | – | – | – | – | – | – |
| Kevin T. Clayton | – | – | – | – | – | – |
| Jeffrey J. O'Neill | – | – | – | – | – | – |
| Bernard Lanigan, Jr. | – | – | – | – | – | – |

## C. The Preclusive Deal Protection Devices

44.     As part of the Merger Agreement, Defendants agreed to certain preclusive deal protection devices that ensure that no competing offers for the Company will emerge.

45.     By way of example, section 6.03(a) of the Merger Agreement includes a "no solicitation" provision barring the Company from soliciting or encouraging the submission of an acquisition proposal. Section 6.03(e) demands that the Company cease and terminate all solicitations, discussions or negotiations with any party concerning an acquisition proposal. Further, this provision fails to provide a "go-shop" period that would allow the Board to rightfully seek out a better offer for the company

46.     Despite already locking up the Proposed Transaction by agreeing not to solicit alternative bids, the Board consented to additional provisions in the Merger Agreement that further guarantee the Company's only suitor will be NRD Capital. For example, pursuant to section

13

6.03(c) of the Merger Agreement, the Company must notify RTI Holdings, LLC of any offer, indication of interest, or request for information made by an unsolicited bidder. Thereafter, should the Board determine that the unsolicited offer is superior, section 6.03(c) requires that the Board grant RTI Holdings, LLC five (5) business days to negotiate the terms of the Merger Agreement to render the superior proposal no longer superior. NRD Capital is able to match the unsolicited offer because, pursuant to section 6.03(c)(ii) of the Merger Agreement, the Company must provide RTI Holdings, LLC with the identity of the party making the proposal and the material terms of the superior proposal, eliminating any leverage that the Company has in receiving the unsolicited offer.

47. In other words, the Merger Agreement gives NRD Capital access to any rival bidder's information and allows NRD Capital a free right to top any superior offer. Accordingly, no rival bidder is likely to emerge and act as a stalking horse for Ruby Tuesday, because the Merger Agreement unfairly assures that any "auction" will favor NRD Capital and allow NRD Capital to piggy-back upon the due diligence of the foreclosed second bidder.

48. In addition, pursuant to section 11.05(b) of the Merger Agreement, Ruby Tuesday must pay NRD Capital a termination fee of $7.5 million if the Company decides to pursue another offer, thereby essentially requiring that the alternate bidder agree to pay a naked premium for the right to provide the shareholders with a superior offer.

49. Ultimately, these preclusive deal protection provisions restrain the Company's ability to solicit or engage in negotiations with any third party regarding a proposal to acquire all or a significant interest in the Company. The circumstances under which the Board may respond to an unsolicited written bona fide proposal for an alternative acquisition that constitutes or would reasonably be expected to constitute a superior proposal are too narrowly circumscribed to provide

14

an effective "fiduciary out" under the circumstances. Likewise, these provisions also foreclose any likely alternate bidder from providing the needed market check of NRD Capital's inadequate offer price.

**D. The Materially Incomplete and Misleading Proxy**

50.　The Individual Defendants owe the stockholders a duty of candor. They must disclose all material information regarding the Proposed Transaction to Ruby Tuesday stockholders so that they can make a fully informed decision whether to vote in favor of the Proposed Transaction.

51.　On October 31, 2017, Defendants filed the Proxy with the SEC. The purpose of the Proxy is, inter alia, to provide the Company's stockholders with all material information necessary for them to make an informed decision on whether to vote their shares in favor of the Acquisition. However, significant and material facts were not provided to Plaintiff and the Class. Without such information, Ruby Tuesday shareholders cannot make a fully informed decision concerning whether or not to vote in favor of the Proposed Transaction.

*Materially Misleading Statements/Omissions Regarding the Management-Prepared Financial Forecasts*

52.　The Proxy discloses management-prepared financial projections for the Company which are materially misleading. The Proxy indicates that in connection with the rendering of UBS's fairness opinion, UBS reviewed "certain internal financial information and other data relating to the business and financial prospects of Ruby Tuesday . . . including financial forecasts and estimates prepared by the management of Ruby Tuesday." Accordingly, the Proxy should have, but failed to, provide certain information in the projections that Ruby Tuesday's management provided to the Board and UBS.

15

53.     Notably, Defendants failed to disclose projections for fiscal years 2018 to 2022 for depreciation and amortization and stock-based compensation expense. Also, Defendants use the term "Restaurant Level EBITDA" but fail to define it. This omitted information is necessary for Ruby Tuesday stockholders to make an informed decision on whether to vote in favor of the Proposed Transaction.

### Materially Incomplete and Misleading Disclosures Concerning UBS's Financial Analyses

54.     First, with respect to the *Discounted Cash Flow Analysis,* the Proxy fails to disclose the individual inputs and assumptions utilized by UBS to derive the discount rate range of 9.5% to 10.5%. The Proxy also fails to disclose the range of implied terminal EBITDA multiples resulting from the analysis. In addition, the Proxy fails to disclose how UBS treated stock-based compensation expense for the purposes of this analysis.

55.     Second, with respect to the *Selected Precedent Transactions Analysis*, the Proxy fails to disclose the objective selection criteria for each transaction, as well as the multiples for EV/LTM EBITDA for each company.  The Proxy also fails to disclose whether UBS performed any type of benchmarking analysis for Ruby Tuesday in relation to the selected public companies.

56.     Finally, with respect to the *Selected Companies Analysis,* the Proxy fails to disclose the objective selection criteria for each company, as well as the multiples for EV/NTM EBITDA for each company. The Proxy also fails to disclose whether UBS performed any type of benchmarking analysis for Ruby Tuesday in relation to the selected target companies.

### Materially Incomplete and Misleading Disclosures Concerning the Flawed Process

57.     The Proxy also fails to disclose material information concerning the sales process. The Board discussed with UBS conducting a valuation of Ruby Tuesday's real estate holdings in January 2017, but the Proxy is silent as to whether the Board ever conducted such a valuation. If

16

such a valuation did occur, the Proxy does not disclose how, if at all, that valuation impacted the Board's negotiations and discussions with Bidder 8, Bidder 11 and NRD Capital.

58.     The Proxy mentions that on various occasions, UBS provided the Board with the Company's valuation based on financial projections provided by Ruby Tuesday's management. Yet the Proxy fails to disclose those projections and the valuation provided by UBS, specifically those projections and valuations as discussed at the Board meetings on January 4, 2017, February 13, 2017, March 10, 2017 and June 14, 2017.

59.     In addition, the Proxy fails to disclose how the 47 parties engaged in discussions with UBS were contacted or whether they contacted UBS or the Company. The Proxy similarly fails to disclose how, if parties were contacted by UBS, those parties were selected, as well as the specific number of each type of party.

60.     The Proxy also fails to disclose who requested that Davis Polk send an initial draft of a merger agreement to NRD on March 19, 2017, as well as who directed UBS to send letters to 19 parties in late March 2017.

61.     Finally, the Proxy fails to disclose whether UBS had any relationships with NRD Capital. Instead, UBS's opinion focuses on its relationship with RTI Holding Company, LLC, stating: "UBS has not in the past two years provided, and is not currently providing, financial advisory or investment banking services to Holding or its affiliates for which UBS has received compensation." While the Proxy notes that NRD Capital is an affiliate of RTI Holding Company, LLC, the language of the Proxy is misleading and confusing, especially when UBS specifically provided disclosure letters to the Board on January 23, 2017 and on October 13, 2017 concerning certain investment banking relationships with NRD Capital.

62.     This information is necessary to provide Company stockholders a complete and

17

accurate picture of the sales process and its fairness. Without this information, stockholders were not fully informed as to the defendants' actions, including those that may have been taken in bad faith, and cannot fairly assess the process. And without all material information, Ruby Tuesday stockholders are unable to make a fully informed decision in connection with the Proposed Acquisition and face irreparable harm, warranting the injunctive relief sought herein.

63.     In addition, the Individual Defendants knew or recklessly disregarded that the Proxy omits the material information concerning the Proposed Transaction and contains the materially incomplete and misleading information discussed above.

64.     Specifically, the Individual Defendants undoubtedly reviewed the contents of the Proxy before it was filed with the SEC. Indeed, as directors of the Company, they were required to do so. The Individual Defendants thus knew or recklessly disregarded that the Proxy omits the material information referenced above and contains the incomplete and misleading information referenced above.

65.     Further, the Proxy indicates that on October 15, 2017, UBS reviewed with the Board its financial analysis of the Merger Consideration delivered to the Board an oral opinion, which was confirmed by delivery of a written opinion dated October 16, 2017, to the effect that the Merger Consideration was fair, from a financial point of view, to Ruby Tuesday shareholders. Accordingly, the Individual Defendants undoubtedly reviewed or were presented with the material information concerning UBS's financial analyses which has been omitted from the Proxy, and thus knew or should have known that such information has been omitted.

66.     Plaintiff and the other members of the Class are immediately threatened by the wrongs complained of herein, and lack an adequate remedy at law. Accordingly, Plaintiff seeks injunctive and other equitable relief to prevent the irreparable injury that the Company's

shareholders will continue to suffer absent judicial intervention.

## CLAIMS FOR RELIEF

### COUNT I

**On Behalf of Plaintiff and the Class Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

67.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

68.     Defendants have filed the Proxy with the SEC with the intention of soliciting Ruby Tuesday shareholder support for the Proposed Transaction.  Each of the Individual Defendants reviewed and authorized the dissemination of the Proxy, which fails to provide the material information referenced above.

69.     In so doing, Defendants made materially incomplete and misleading statements and/or omitted material information necessary to make the statements made not misleading.  Each of the Individual Defendants, by virtue of their roles as officers and/or directors of Ruby Tuesday, were aware of the omitted information but failed to disclose such information, in violation of Section 14(a).

70.     Rule 14a-9, promulgated by the SEC pursuant to Section 14(a) of the Exchange Act, provides that such communications with shareholders shall not contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading." 17 C.F.R. § 240.14a-9.

71.     Specifically, and as detailed above, the Proxy violates Section 14(a) and Rule 14a-9 because it omits material facts concerning: (i) management's financial projections; (ii) the value of Ruby Tuesday shares and the financial analyses performed by UBS in support of its fairness

19

opinion; and (iii) the sales process.

72.     Moreover, in the exercise of reasonable care, the Individual Defendants knew or should have known that the Proxy is materially misleading and omits material information that is necessary to render it not misleading.  The Individual Defendants undoubtedly reviewed and relied upon the omitted information identified above in connection with their decision to approve and recommend the Proposed Transaction; indeed, the Proxy states that UBS reviewed and discussed its financial analyses with the Board during various meetings including on October 15, 2017, and further states that the Board relied upon UBS's financial analyses and fairness opinion in connection with approving the Proposed Transaction. The Individual Defendants knew or should have known that the material information identified above has been omitted from the Proxy, rendering the sections of the Proxy identified above to be materially incomplete and misleading.

73.     The misrepresentations and omissions in the Proxy are material to Plaintiff and the Class, who will be deprived of their right to cast an informed vote if such misrepresentations and omissions are not corrected prior to the vote on the Proposed Transaction.  Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## COUNT II

**On Behalf of Plaintiff and the Class against the Individual Defendants for Violations of Section 20(a) of the Exchange Act**

74.     Plaintiff incorporates each and every allegation set forth above as if fully set forth herein.

75.     The Individual Defendants acted as controlling persons of Ruby Tuesday within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their positions as

20

officers and/or directors of Ruby Tuesday and participation in and/or awareness of the Company's operations and/or intimate knowledge of the incomplete and misleading statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Plaintiff contends are materially incomplete and misleading.

76.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to the time the Proxy was filed with the SEC and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

77.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the Exchange Act violations alleged herein, and exercised the same. The omitted information identified above was reviewed by the Board prior to voting on the Proposed Transaction. The Proxy at issue contains the unanimous recommendation of each of the Individual Defendants to approve the Proposed Transaction. They were, thus, directly involved in the making of the Proxy.

78.     In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger Agreement. The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered. The Individual Defendants participated in drafting and/or gave their input on the content of those descriptions.

79.     By virtue of the foregoing, the Individual Defendants have violated Section 20(a)

21

of the Exchange Act.

80.     As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Individual Defendants' conduct, Plaintiff and the Class will be irreparably harmed.

81.     Plaintiff and the Class have no adequate remedy at law.  Only through the exercise of this Court's equitable powers can Plaintiff and the Class be fully protected from the immediate and irreparable injury that Defendants' actions threaten to inflict.

## RELIEF REQUESTED

WHEREFORE, Plaintiff demands injunctive relief in her favor and in favor of the Class and against the Defendants jointly and severally, as follows:

A.     Declaring that this action is properly maintainable as a Class Action and certifying Plaintiff as Class Representatives and her counsel as Class Counsel;

B.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from filing a Definitive Proxy with the SEC or otherwise disseminating a Definitive Proxy to Ruby Tuesday shareholders unless and until Defendants agree to include the material information identified above in the Definitive Proxy;

C.     Preliminarily and permanently enjoining Defendants and their counsel, agents, employees and all persons acting under, in concert with, or for them, from proceeding with, consummating, or closing the Proposed Transaction, unless and until Defendants disclose the material information identified above which has been omitted from the Proxy;

22

D.      In the event that the transaction is consummated prior to the entry of this Court's final judgment, rescinding it or awarding Plaintiff and the Class rescissory damages;

E.      Directing the Defendants to account to Plaintiff and the Class for all damages suffered as a result of their wrongdoing;

F.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and expert fees and expenses; and

G.      Granting such other and further equitable relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.


Dated: November 9, 2017                 **HOLIFIELD JANICH RACHAL & ASSOCIATES, PLLC**

                                                    */s/ Al Holifield*
                                                    _____
                                                    Al Holifield, Esq. (BPR # 015494)
                                                    Sarah R. Johnson, Esq. (BPR # 030781)
                                                    11907 Kingston Pike
                                                    Suite 201
                                                    Knoxville, TN 37934
                                                    Tel: (865) 566-0115
                                                    Fax: (865) 566-0119

**OF COUNSEL:**

**ROWLEY LAW PLLC**
Shane T. Rowley
Danielle Rowland Lindahl
50 Main Street, Suite 1000
White Plains, NY 10606
Tel: (914) 400-1920
Fax: (914) 301-3514
*Pro Hac Vice Application to be submitted*

23